AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | |
| VALENTIN GUZMAN, | Case No.    2:22-mj-00195 |
| Defendant | |

FILED
CLERK, U.S. DISTRICT COURT

**1/17/2022**

CENTRAL DISTRICT OF CALIFORNIA
BY: ____ jb ____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 13, 2021, in the County of Los Angeles in the Central District of California, the defendant( violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 841(a) | Possession with Intent to Distribute Fentanyl |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*FBI SA Jennifer Bannon*
*Complainant's signature*

_____
Jennifer Bannon, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   January 17, 2022

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Jean Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

AUSA: Samuel J. Diaz (213) 894-3045

## AFFIDAVIT

I, Jennifer Bannon, being duly sworn, declare and state as
follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal
complaint and arrest warrant against VALENTIN GUZMAN ("GUZMAN")
for a violation of 21 U.S.C. § 841(a)(1), possession with intent
to distribute fentanyl.

2.   This affidavit is also made in support of an
application for a warrant to search the following digital
devices (collectively, the "SUBJECT DEVICES"), in the custody of
the Oxnard Police Department, in Oxnard, California, as
described more fully in Attachment A-1:

a.   a black iPhone in an Otter Box case, Oxnard
Police Department barcode number 416810 ("SUBJECT DEVICE 1");

b.   a black iPhone 7 in a black Otter Box case,
serial number DX3Y1UM9HG6W, Oxnard Police Department barcode
416811 ("SUBJECT DEVICE 2"); and

c.   a black Galaxy Note9 in an "El Lumiere" case,
serial number R38K709ZLHA, Oxnard Police Department barcode
416865 ("SUBJECT DEVICE 3").

3.   This affidavit is also made in support of an
application for a warrant to search a 1996 Nissan pickup truck,
with California license plate number 5Y97976, registered to G.G.
(the "SUBJECT VEHICLE"), as described more fully in Attachment
A-2.

4.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 846 (conspiracy to distribute a controlled substance); 21 U.S.C. § 841(a)(1) (possession with intent to distribute fentanyl); 21 U.S.C. § 843(b) (use of a communication facility to facilitate a narcotics trafficking offense); 18 U.S.C. § 1956(h) (money laundering conspiracy); 18 U.S.C. § 924(c) (possession of firearms in furtherance of drug trafficking crimes); and 18 U.S.C. § 922(g) (felon in possession of firearms and ammunition) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

6.    I am a Special Agent ("SA") with the FBI and have been so employed since 2006.  As such, I am an investigative and law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7).

7.   Since 2006, I have participated in numerous counter-terrorism investigations that focused on large networks of terrorist sympathizers and supporters residing in the United States and abroad.

8.   In July 2011, I was assigned to work on the Regional Narcotics Suppression Program ("RNSP"), a federally-funded High Intensity Drug Trafficking Area ("HIDTA") task force that consists of the FBI, the Drug Enforcement Administration, the Orange County Sheriff's Department ("OCSD"), the Santa Ana Police Department, and several other local police departments. RNSP is responsible for working crimes committed by Drug Trafficking Organizations ("DTOs"), under Titles 18 and 21 of the United States Code.  I have received training in asset forfeiture, cellular phone analysis, investigating complex narcotics organizations, and advanced interviewing and interrogation techniques.

9.   In July 2018, I was transferred to the FBI Ventura Resident Agency where I continue to investigate drug trafficking, money laundering investigations, and violent crimes.  I have participated in investigations concerning the identification of co-conspirators through the use of telephone records, financial records, photographs, and other documents.  I have conducted physical surveillance in connection with narcotics investigations.  I have also participated in investigations involving the use of Title III wiretaps to monitor the phones and devices of target subjects.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

10.  On January 13, 2022, FBI Task Force Officers ("TFOs") Kevin Fessler and Jack Martin from the Oxnard Police Department saw GUZMAN, a suspected drug trafficker known to the TFOs, parked in front of the home of another suspected drug dealer's residence.  GUZMAN was driving the SUBJECT VEHICLE.  The TFOs followed GUZMAN as he drove away from the residence and observed GUZMAN violate several California Vehicle Code ("CVC") sections.  The TFOs conducted a traffic stop, during which GUZMAN showed signs and symptoms of driving under the influence, in violation of CVC Section 23152(a).

11.  During the traffic stop, the TFOs asked GUZMAN if he had any weapons or illegal contraband on his person, to which he answered "no."  The TFOs instructed GUZMAN to exit the vehicle for the purpose of conducting a field sobriety test.  As he was exiting the vehicle, they saw a clip in GUZMAN's waistband consistent with a concealed knife.  GUZMAN began to resist the TFOs' commands and appeared to reach for the knife clip.  As GUZMAN continued to resist, the TFOs pinned him to their vehicle.  While the TFOs were attempting to remove the knife and continue a safety search for weapons on GUZMAN's person, GUZMAN began to actively resist by twisting away from TFO Fessler's grip.  TFO Fessler then observed a plastic bag protruding from the bulge in GUZMAN's left front pocket, consistent with drug packaging.  TFO Fessler removed the bag from GUZMAN's pocket and saw suspected fentanyl in the bag.  TFO Martin searched GUZMAN's other pocket and located approximately $4,192 in cash.  The TFOs

also searched the SUBJECT VEHICLE and found SUBJECT DEVICE 1 and SUBJECT DEVICE 2 (the two black iPhones) on the front bench seat of the Nissan truck, within arms-reach of the driver's seat.

12. Following GUZMAN's arrest, law enforcement obtained a California state search warrant for GUZMAN's residence.  During the search of GUZMAN's residence, law enforcement recovered, among other things, 314 grams of suspected fentanyl, 63.9 grams of suspected crystal methamphetamine, approximately $950,000 in bulk cash, and two firearms.  The firearms consisted of one Smith & Wesson .38 caliber revolver and one Ruger 9mm handgun. In addition, law enforcement found a black Galaxy Note9 phone (SUBJECT DEVICE 3), located inside the residence.

## IV. STATEMENT OF PROBABLE CAUSE

13. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   Background of the Investigation

14. Between September 2018 to March 2019, TFO Martin reviewed at least three different Ventura County Sheriff's Office ("VCSO") reports that contained information from inmates in VCSO custody.  The reports identified GUZMAN as a local narcotics dealer who, in many cases, supplied the inmates or the inmates' associates with drugs.  The inmates provided this information for consideration in pending criminal matters. Throughout 2019 and 2020, investigators conducted a state investigation into GUZMAN.  Investigators conducted surveillance of GUZMAN and observed GUZMAN at his residence, identified as

1331 Bottlebrush Place, Oxnard, California (the "GUZMAN residence").

15.   TFO Martin conducted law enforcement database checks for GUZMAN.  A California Department of Motor Vehicles ("DMV") records check showed GUZMAN's driver license number as B8328070.  Records checks also show that in May 2000, GUZMAN was convicted for possession the intent to sell an illegal controlled substance in violation of California Health and Safety Code Section 11351.5.  In February 2009, he was convicted of conspiracy to distribute an illegal controlled substance in violation of California Health and Safety Code Section 182.  GUZMAN also has multiple arrests for possession and transportation of a controlled substance for sales in violation of California Health and Safety Code Sections 11351 and 11352, in addition to arrests for participation in a criminal street gang, robbery, assault with a deadly weapon, and illegal possession of a concealed firearm.

16.   In August 2019, TFO Martin was in contact with an Oxnard Police Department confidential source[1] (the "CS").  The CS identified GUZMAN as a drug dealer who sells crystal methamphetamine and heroin from his mother's residence in Oxnard, California (hereafter the "mother's residence").  TFO Martin obtained a booking photograph of GUZMAN and showed it to

---

[1] The CS has multiple narcotics arrests and convictions. The CS provided information in exchange for charging consideration in a pending criminal matter.  The CS has misdemeanor convictions for trespassing, possession of a controlled substance, and petty theft.

the CS.  The CS positively identified GUZMAN, GUZMAN's
residence, and his mother's residence.

17.  In January 2020, TFO Martin met with the CS for the
purpose of making a phone call to arrange a controlled buy of a
large amount of crystal methamphetamine from GUZMAN.  TFO Martin
monitored and recorded the telephone call between the CS and
GUZMAN.  During the call, the CS asked to purchase crystal
methamphetamine from GUZMAN.  GUZMAN agreed to sell the CS the
crystal methamphetamine and told the CS to come to the GUZMAN
residence.  Law enforcement ultimately decided not to proceed
with the controlled purchase of crystal methamphetamine from
GUZMAN at that time.

18.  In late February 2020, detectives conducted
surveillance at GUZMAN's residence.  During this time,
detectives observed GUZMAN driving the SUBJECT VEHICLE.  The
SUBJECT VEHICLE is registered to G.G. at an address on Campton
Drive in Oxnard, California.

19.  In late February 2020, TFO Martin and VCSO Detective
Christian Freede met with the CS for the purpose of making a
controlled purchase of crystal methamphetamine from GUZMAN.
Detective Freede and TFO Martin monitored and recorded the
telephone call between CS and GUZMAN.  After the phone call was
made, detectives continued their surveillance of the GUZMAN
residence.  They observed GUZMAN exit the residence carrying a
flashlight with a second unknown male.  As the men walked by a
vehicle parked on the street, they shined a flashlight through
the windows and peered inside.  Based on my training and

experience, I recognize this behavior to be counter-surveillance which is frequently utilized by narcotics traffickers to thwart surveillance by law enforcement and to avoid detection of their illegal trafficking activities.  Further, I know that narcotics traffickers engage in counter-surveillance immediately following or prior to engaging in narcotics trafficking activities.

20.  While searching vehicles parked within sight of his residence, GUZMAN located a plain clothes detective conducting surveillance in an unmarked unit.  Law enforcement did not proceed with the planned controlled buy at that time.

**B.    On January 13, 2021, Oxnard Police Department Detectives Found GUZMAN Carrying Suspected Fentanyl following a Traffic Stop**

21.  On January 13, 2022, at approximately 9:30 a.m., TFO Martin was working uniformed patrol in a marked Oxnard Police Department patrol unit in the City of Oxnard with TFO Kevin Fessler, when TFO Martin observed the SUBJECT VEHICLE, which they knew to be a truck GUZMAN used.  The TFOs circled the neighborhood and saw the SUBJECT VEHICLE parked in front of a residence on West Date Street in Oxnard, California (the "Date Street residence").

22.  From their prior investigation, the TFOs knew that a suspected drug dealer, J.P., lived at the Date Street residence, and they had information that GUZMAN was J.P's narcotics supplier.  Based on this information, the TFOs suspected that GUZMAN was visiting J.P. at the Date Street residence for the purpose of supplying J.P. with narcotics and collecting payment for the narcotics.

23.   After GUZMAN left the Date Street residence in the
SUBJECT VEHICLE, TFO Martin and TFO Fessler observed GUZMAN
violate the following CVC sections:

a.   Section 21717 – driver shall drive the motor
vehicle into the bicycle lane prior to making a turn;

b.   Section 22100(a) – a right-hand turn shall be
made as close as practical to end of roadway; and

c.   Section 22108 – driver must signal 100 feet prior
to a turning movement.

24.   Based upon the fact that TFO Fessler and TFO Martin
thought based on their training and experience that GUZMAN had likely
~~observed GUZMAN engage in a suspected narcotic sales transaction,~~
just engaged in a narcotic sales transaction
and the aforementioned violations of the California Vehicle
Code, TFOs Fessler and Martin activated their overhead forward
facing emergency lights and stopped the SUBJECT VEHICLE.  The
TFOs walked up to the SUBJECT VEHICLE and saw that GUZMAN was
the sole occupant.  TFO Martin saw a large bulge in GUZMAN's
right shorts' pocket, brought it to TFO Fessler's attention, and
heard GUZMAN say that he had just picked up an estimated $2,000
from "a friend," who the TFOs suspected was a reference to J.P.

25.   As TFO Fessler and TFO Martin spoke with GUZMAN, they
observed signs and symptoms that GUZMAN was under the influence
of a controlled substance.  According to the police report of
the traffic stop, TFO Martin asked GUZMAN to close his eyelids
and TFO Martin saw that during the brief period he had them
closed, GUZMAN's eyelids appeared to flutter, and his pupils
appeared unreactive when he reopened them.

26.  TFO Fessler asked GUZMAN if he had any weapons on him prior to removing GUZMAN from the SUBJECT VEHICLE to continue evaluating whether GUZMAN was under the influence of a controlled substance.  GUZMAN denied having any weapons. Despite GUZMAN's denial, TFO Fessler saw a clip on GUZMAN's waistband that looked like a knife clip.  GUZMAN reached towards it, at which time, the TFOs ordered him to stop moving.  TFO Fessler removed GUZMAN from the vehicle in order to confirm that GUZMAN did not have any weapons.  After removing GUZMAN from the vehicle, the TFOs observed a knife clipped inside GUZMAN's waistband which they removed and secured.  Due to the fact that GUZMAN had lied to the TFOs when he said he did not have a weapon, TFO Fessler attempted to continue to pat GUZMAN down for any additional concealed weapons.  GUZMAN then began to twist away from TFO Fessler's grasp, at which time, TFO Martin grabbed GUZMAN's left arm to prevent him from escaping or grasping any possible concealed weapons.  GUZMAN continued to resist and knocked TFO Martin's department issued body worn camera device to the ground.  Due to the fact that GUZMAN was in possession of a concealed weapon and actively resisting detention in violation of California Penal Code Section 148, TFO Fessler and TFO Martin handcuffed GUZMAN in order to prevent his escape, ensure officer safety, and continue their investigation.

27.  Once GUZMAN was in handcuffs, TFO Fessler looked down and saw, in plain view, a plastic baggie containing a white substance visible inside GUZMAN's left shorts pocket, which had gaped open.  TFO Fessler told me that, based on his training and

experience, he believed the plastic baggie contained a large salable quantity of concentrated fentanyl.  The suspected fentanyl weighed approximately 68.8 gross grams.  Additionally, GUZMAN was found to be in possession of $4,192.00 in small denominations of US currency in his right shorts pocket.

28.  GUZMAN was placed under arrest and transported to the Oxnard Police Department Jail where he was processed.  During an inventory search of the SUBJECT VEHICLE, investigators located an operational digital scale hidden under the front seat, and SUBJECT DEVICE 1 and SUBJECT DEVICE 2 on the front passenger bench seat of the SUBJECT VEHICLE.  The SUBJECT VEHICLE was then towed to a police garage in Oxnard, California.

**C.   Seizure of Drugs and Money at GUZMAN's Residence**

29.  Following GUZMAN's arrest, TFO Martin authored a California state search warrant for the GUZMAN residence, case number 22-002737, which was signed by the Honorable Rhonda McKaig of the Ventura County Superior Court on January 13, 2022, at 2:13 p.m.  The warrant was executed at approximately 3:32 p.m.  During the search of the residence, law enforcement recovered:

a.   314 grams of suspected fentanyl;

b.   63.9 grams of suspected crystal methamphetamine;

c.   indicia of narcotic sales including digital scales with narcotic residue and ziplock baggies (packaging materials);

d.   Approximately $950,000 in cash located in various locations throughout the residence and inside a red and white

Chevrolet Corvette ("Chevrolet") parked in the driveway of the residence;

e.    A black Galaxy Note9 phone (SUBJECT DEVICE 3), located inside the residence;

f.    16 pill bottles containing approximately 830 grams of suspected fentanyl pills;

g.    A suspected pay owe sheet with names and dollar amounts.

30.    During a search of the Chevrolet in the driveway where the bulk cash was located, investigators located two handguns, one Smith and Wesson .38 revolver (serial number CJT1943) and one Ruger 9mm handgun (serial number 323-49424), both reported stolen.  The Ruger 9mm handgun was loaded, and there was a box of .38 special ammunition with the revolver.  GUZMAN is a convicted felon and prohibited from possession of firearms and ammunition.  TFO Fessler and TFO Martin provided GUZMAN with his Miranda rights from an Oxnard Police Department-issued Miranda card, and GUZMAN informed them that he understood his rights by replying "yeah" and then stated he had nothing to say to the TFOs and the interview was terminated.

## V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

31.    Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and

deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

        b.    Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where the drug trafficker has ready access to them, such as in
their residences and vehicles (including hidden traps in
vehicles that may not be found during an initial, cursory
search), and on their cell phones and other digital devices.

        c.    Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to
have photos and videos on their cell phones of drugs they or
others working with them possess, as they frequently send these
photos to each other and others to boast about the drugs or
facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on

their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

   e.   Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

32.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

   a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

   b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### VII.  **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

33.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

34.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

35.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

36.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Valentin GUZMAN's thumb- and/or fingers on the devices; and (2) hold the devices in front of Valentin GUZMAN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

37.  Oxnard Police Department investigators reviewed the phone in order to obtain the make, model and phone number of the phone, as well as conducted a cursory review of messages in two of the devices as permitted under the state-issued warrant.  The third device was locked; however, recent messages were visible on the home screen.  TFO Martin observed text messages depicting coded language.  For example, one message stated, "What up g can I go by for half of the pink cookie." Based on my training and experience, I know that drug traffickers often use coded language to avoid law enforcement detection.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

## VIII.    <u>CONCLUSION</u>

38.   For all of the reasons described above, there is probable cause to believe that GUZMAN has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES, and the SUBJECT VEHICLE described in Attachments A-1, and A-2, respectively.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 17th day of
January, 2022.

_____
HONORABLE JEAN ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE

20